<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|                          |   |                                    |
|--------------------------|---|------------------------------------|
| JERMAINE A. WILLIAMS,    | : | Civil Action No. 09-1822 (DRD)     |
|                          | : |                                    |
| Petitioner,              | : |                                    |
|                          | : |                                    |
| v.                       | : |                                    |
|                          | : |                                    |
| MICHELLE R. RICCI, et al., | : | **O P I N I O N**                |
|                          | : |                                    |
| Respondents.             | : |                                    |

---

**Debevoise**, District Judge:

This matter comes before the Court upon: (a) receipt of Petitioner's counseled brief, which arrived accompanied by exhibits filed in support of Petitioner's Ground One challenges; (b) Respondents' filing of a letter, formal brief and supporting exhibits opposing Petitioner's Ground One claims raised in the Petition and elaborated upon in Petitioner's counseled brief; and (c) Petitioner's submission of his <u>pro</u> <u>se</u> brief and <u>pro</u> <u>se</u> traverse, filed seemingly with the goal to cure what Petitioner perceived as shortcomings in the brief submitted by his appointed counsel. <u>See</u> Docket Entries Nos. 37-39, 41-44 and 46.

For the reasons detailed below, Petitioner's Ground One challenges will be dismissed, as not warranting habeas relief. Respondents will be directed to answer the remainder of Petitioner's Grounds. The limited appointment of Petitioner's counsel will be terminated, with renewal of the same reserved.

## I.   INTRODUCTION

Typically, a judicial decision examining habeas challenges opens with a discussion of the underlying facts, proceeds to briefly summarizing the standard of review and concludes with application of substantive tests to the claims raised by the habeas litigant.  However, little has been typical about the case at bar.  Therefore, assessing the relevant legal considerations and dense factual predicate underlying Petitioner's claims, it appears warranted to alter the usual continuum by: (a) opening with a summary of procedural history accrued in this matter; then (b) summarizing just a few key aspects of the standard of review; (c) upon carefully detailing the underlying facts, (d) addressing the latest legal position taken by Respondents; and (e) closing by examining the factual predicate present here under the governing substantive test.

## II.  PROCEDURAL HISTORY

This matter was commenced upon the Clerk's receipt of Petitioner's pro se petition seeking habeas relief pursuant to 28 U.S.C. § 2254.  See Docket Entry No. 1.  Yet, shortly after initiation of this action, Petitioner filed an application requesting stay of the instant matter to accommodate his intent to exhaust his unexhausted claims in state fora.  See Docket Entry No. 4.  The Court, thus, issued an order granting Petitioner the requested stay.  See Docket Entries Nos. 5 and 6.

2

However, shortly thereafter, Petitioner filed a motion requesting reopening of this matter and notifying the Court that he elected to seek habeas relief solely on his already exhausted claims. See Docket Entry No. 8. This Court, therefore, provided Petitioner with notice, pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and directed him to submit his amended pleading stating only the claims he wished to litigate. See Docket Entry No. 11.

Petitioner responded by filing his amended petition and a brief elaborating on his claims. See Docket Entries Nos. 13 and 14. That brief indicated his intent to raised four umbrella-type challenges, with the fourth challenge consisting of the "a" to "o" claims, i.e., effectively asserted fifteen different grounds. See id. The Court, thus, directed Respondents to answer the amended petition. See Docket Entry No. Respondents, being then represented by counsel who later withdrew, filed an answer and exhibits, see Docket Entries Nos. 19 and 20, but that answer insufficiently addressed Petitioner's challenges.

The Court, hence, subdivided Petitioner's challenges into two groups: the first group consisted solely of Petitioner's Ground One, while the second group embraced Petitioner's remaining fourteen claims. See Docket Entry No. 23.

With regard to the former, the Court: (a) directed the Clerk to appoint a federal public defender to represent Petitioner; and

(b) ordered the parties to re-brief Petitioner's Ground One.[1]
See id. Both sides complied. See Docket Entries Nos. 29 and 30.

Having examined the re-briefing submissions, the Court: (a)
noted that the parties were not in dispute as to the substantive
legal principle governing Petitioner's right-to-presence
challenges raised in his Ground One; but (b) the parties omitted
to address how these principles applied to Petitioner's rather
unique circumstances. See Docket Entry No. 31. Thus, the Court
directed the parties to supplement their re-briefs by stating
their positions on that issue. See id.

Since the Court's order to that effect was not immediately
complied with, the Court granted a sua sponte extension of time
to supplement the parties' re-briefs.[2] See Docket Entry No. 33.
Both sides duly made their filings.[3] See Docket Entries Nos. 38-
39, 41-43. However, shortly thereafter, being seemingly
unsatisfied with two rounds of counseled briefs filed by his
appointed counsel, Petitioner filed his own supplement. See

---

[1] As to the second group of Petitioner's challenges, the
Court directed stay, upon expiration of which Respondents would
be directed to file a new answer: addressing these fourteen
challenges, and Petitioner would be allowed to traverse.

[2] At this point, Respondents' prior counsel was
substituted by current counsel. See Docket Entries Nos. 34-36.

[3] The Court already noted the thoroughness of submissions
filed by Petitioner's appointed counsel and of Respondents'
original counsel's re-brief, and takes this opportunity to
reiterate the same praise.

Docket Entry No. 44.  Since that filing was neither provided for nor envisioned in the Court's order directing supplemental re-briefing, the Court offered Respondents an opportunity to file a sur-reply to Petitioner's submission and, if such sur-reply were filed, allowed Petitioner's appointed counsel an opportunity to traverse.  See Docket Entry No. 45.  Although neither Petitioner's counsel nor Respondents took advantage of the Court's offer, standing on the arguments raised in their prior filings, see, generally, Docket, Petitioner -- seemingly misreading the Court's directive -- filed yet another supplement, effectively reiterating and elaborating on the arguments already raised in his prior filings.  See Docket Entry No. 46.

The substantial mass of these filings is presently before the Court.  To the degree it appears feasible, the Court will address the parties' positions seriatim.

## III. KEY LEGAL PRINCIPLES

The general standard of federal habeas review is long-established, and it sets forth a narrowly-tailored test.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner").  Thus, Section 2254(a) permits a federal court to entertain only claims alleging that a person is held in state custody "in violation of the Constitution or laws

or treaties of the United States."  28 U.S.C. § 2254(a).  The
AEDPA further limits a federal court's authority to grant habeas
relief by providing that, when a state court has adjudicated a
petitioner's federal claim on the merits, a district court "has
no authority to issue the writ of habeas corpus unless the [state
court's] decision 'was contrary to, or involved an unreasonable
application of, clearly established Federal Law, as determined by
the Supreme Court of the United States,' or 'was based on an
unreasonable determination of the facts in light of the evidence
presented in the state court proceeding.'"  <u>Parker v. Matthews</u>,
132 S. Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).

    Consequently, the starting point of federal habeas review
under § 2254(d)(1) analysis is to determine the relevant law
clearly established by the Supreme Court.[4]  <u>See</u> <u>Yarborough v.
Alvarado</u>, 541 U.S. 652, 660 (2004).  Clearly established law
"refers to the holdings, as opposed to the dicta, of [the Supreme
Court's] decisions [entered by] the time of the relevant

---

    [4]  The only federal law that qualifies as clearly
established is Supreme Court precedent interpreting the
Constitution.  Federal courts sitting in habeas review may not
rely upon non-constitutional Supreme Court decisions to determine
whether § 2254(d) relief is appropriate, since precedents not
based on constitutional grounds are "off the table as far as §
2254(d) is concerned."  <u>Early v. Packer</u>, 537 U.S. 3, 10 (2002)
(<u>per</u> <u>curiam</u>).  Correspondingly, the courts conducting federal
habeas review cannot look to decisions interpreting federal
common law.  <u>See</u> <u>id.</u> (holding inapplicable precedents "based on
[the Supreme Court's] supervisory power over the federal courts,
and not on constitutional grounds").

state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); accord Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

A decision is "contrary to" a Supreme Court holding, within the meaning of 28 U.S.C. § 2254(d)(1), if: (a) the state court outright "contradicts the governing law set forth in [the Supreme Court] cases"; or (b) the state court "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06.

Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. Paramount here, under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410). Correspondingly, the standard posed by federal habeas review "is . . . difficult to meet, [since it is a] highly deferential standard for evaluating state-court rulings, [and that standard] demands that state-court decisions be given the benefit of the doubt." Cullen, 131 S. Ct. at 1398 (citations and internal quotation marks omitted). Moreover, review under § 2254(d) is

limited to the record that was before the state court that adjudicated the claim on the merits.  See id.

## IV.  EVENTS RELEVANT TO PETITIONER'S GROUND ONE CHALLENGES

### A.  Facts Underlying Petitioner's Conviction

The state courts summarized the events underlying Petitioner's conviction as follows:

> [On] the afternoon of September 26, 1999, [Petitioner] and two of his friends, Stuart Jones and Jahkeam Francis, gathered in Newark.  They decided to travel by taxi to the home of Jahkeam's cousin, Althea Cummings, in Paterson.  [Petitioner] was in possession of a silver hand gun.  [He] said that he needed money and would rob someone if he had the opportunity to do so. Late in the afternoon, [Petitioner], Jones and Francis took a taxi to East Orange, and there they got into a livery cab that was driven by another man. [Petitioner] was seated in the rear with Jones. Francis sat up front, alongside of the driver.  The cab stopped at Cummings' mother's home and then proceeded to the intersection of North Fourth Street and Haledon Avenue in Paterson.  There, at approximately 5:30 p.m., [Petitioner] observed Miguel "Danny" Mercado on the sidewalk in front of his father's grocery store. Mercado, who was sixteen-years old, was talking to a friend, Gregory Brown.  Mercado was wearing a thick, gold chain around his neck.  The car stopped and [Petitioner] got out.  He grabbed Mercado from behind, placed the gun to the right side of Mercado's neck and demanded that Mercado give him the chain.  Mercado resisted and attempted to extricate himself from [Petitioner's] grip.  [They] struggled [and Petitioner] shot Mercado in the abdomen, took the necklace, and got back into the cab, which then drove off.  Mercado died the following day as a result of the internal hemorrhaging caused by the gun shot wound in his abdomen.  After the robbery, . . . [Petitioner] told Jones that he wanted to get rid of the gold chain. They sold the chain in New York City, two days later.  . . . In October of 1999, Jones was arrested.  . . . Francis was arrested in March of 2000.  On June 16, 2000, [Petitioner] was arrested in York, Pennsylvania.  The jury found [him] guilty [on the charges of felony-

> murder, robbery, aggravated manslaughter and weapon-
> related offenses. He] was sentenced to an aggregate
> term of life plus five years of imprisonment . . . .

State v. Williams, 2008 WL 4345452, at *1-2 (N.J. Super. Ct. App.

Div. Sep. 25, 2008).

**B.    Petitioner's *Voir Dire* Proceeding**

Petitioner's Ground One is based on his voir dire proceeding

that was affected by the tragic events of September 11 (since the

second day of Petitioner's three-day jury selection process

coincided with that day of national tragedy and prompted the bulk

of in camera conferences during which Petitioner was absent).

Petitioner's appointed counsel and Respondents' original and

current counsel invested admirable efforts into detailing and

sorting out the facts of Petitioner's voir dire, providing the

Court with narratives, statistical charts and tables stating the

facts in support of their respective positions.

Since the relevant factual predicate is dense, and it

features a massive cast of characters,[5] accord Murakush Caliphate

of Amexem Inc. v. New Jersey, 790 F. Supp. 2d 241 (D.N.J. May 13,

2011) ("To put the [list of characters] in perspective, it is

---

[5]    Unfortunately, counsels' discussions are somewhat hard to
follow because: (a) some narratives are organized in terms of
chronological developments, on day-by-day basis, with a multitude
of characters -- whose names the reader might have a problem
committing to his/her memory -- appearing, disappearing and
reappearing again; (b) other narrative and statistical accounts
focus on the issues seemingly favorable to a party's position
but, in actuality, having no relevance to the issues at bar; and
(c) the tables composed, while useful, are not easy to digest.

much like [an alternative] version of Leo Tolstoy's 'War and
Peace'") (quoting <u>Mann v. GTCR Golder Rauner, L.L.C.</u>, 483 F.
Supp. 2d 884, 891 (D. Ariz. 2007)), it appears warranted for the
Court to systemize the relevant facts in the record into an
account allowing the reader an opportunity to navigate through
events.  Hence, examining the <u>voir</u> <u>dire</u> transcripts, <u>see</u> Docket
Entries Nos. 29-2, 29-3, 29-4 and 29-5, the charts composed by
counsel, <u>see</u> Docket Entry No. 30-1, and the narratives they
offered, <u>see</u> Docket Entries Nos. 29, 30, 38 and 42, this Court
reduced the relevant record to the account below.[6]

### 1.   Physical Setting

Throughout the entire process, as during his trial,
Petitioner was free of shackles and handcuffs, wore plain
clothing and was in constant and close communications with his
counsel.  The entire process occurred at the Passaic County
courthouse, which has a circular courtroom design that places the
jurors virtually next to the bench.  Since, due to that design,
all side-bar discussions audible to the court reporter are
inevitably audible to <u>voir</u> <u>dired</u>/impaneled jurors, the resort to
<u>in</u> <u>camera</u> conferences is frequent.  If a criminal defendant, like

---

[6]  There were occasional discrepancies in spellings of the
<u>venire</u> persons' names and an incoherence between some <u>venire</u>
persons' names and the gender of pronouns used to designate those
<u>venire</u> persons.  However, granted the magnitude of the task
performed by counsel on both sides, these occasional typos are
understandable.

Petitioner, were to attend an <u>in camera</u> conference, security concerns would require a sheriff's officer to accompany the defendant to ensure the safety of the judge, counsel and attending venire persons.

 2. **Pretrial Conference**

Petitioner's pretrial conference was held on September 10, 2001.[7]  Petitioner was present at the entire pretrial conference. Multiple issues concerning interactions with <u>venire</u> persons and impaneled jurors were addressed, including such subjects as the scope of each form of communication, procedures to be employed during the jury selection, evidentiary and jury charge aspects, etc.  Special considerations were given to two concerns: (i) the expected extensive length of the trial; and (ii) the likelihood that the trial would continue during the Jewish High Holidays. Petitioner was present at all these exchanges between the judge and counsel, and these discussions expressly put Petitioner on notice that <u>in camera</u> conferences were possible in certain circumstances and particularly likely in light of the length of the upcoming trial and the High Holidays: since the trial judge was willing to address <u>venire</u> persons' concerns on these issues in chambers.

---

 [7]  The pretrial conference was followed by <u>voir dire</u> that began on the same day.

3.   **Voir Dire, Overview**

a.   **September 10, 2001**

Following the pretrial conference, the entire venire was brought in.  The trial judge explained the voir dire process to the venire, pointing out that the potential jurors feeling obligated to share private concerns or seeking to be excused on the basis of personal information that might be too embarrassing to state in public forum could detail the same to the trial judge in camera, in presence of both counsel.  Upon hearing that, Petitioner did not make any statement indicating his desire to accompany his counsel for such in camera proceedings had they to take place.  The voir dire began with fourteen venire persons called for questioning.  Petitioner observed side-bar discussions taking place, but did not make any statements.  At the end of that day, twelve venire persons were selected, with two more were yet to be impaneled.

The trial judge closed by making additional inquiries, stressing the length of the trial.  In response, many of the selectees asserted concerns related to this issue, but -- at that juncture -- no selectee was excused on that ground, and the trial judge offered his assurances that the court would reach out to the jurors' employers to resolve any problem associated with the length of the trial.

12

### b.   September 11, 2001

Terrorists crashed American Airlines Flight 11 into the North Tower of the World Trade Center at 8.46 a.m., shortly before the court convened.  Seventeen minutes later, at 9:03 a.m., a second group of terrorists crashed United Airlines Flight 175 into the South Tower of the World Trade Center.  That act confirmed that a terrorist attack, rather than merely a tragic accident, was underway.  The smoking ruins of the towers were seen from the trial judge's chambers, and -- by the time court convened and the _venire_ persons were brought in, everyone in the court and the courtroom was aware of the events unfolding.  After the questioning of the _venire_ persons resumed, the selectees began reflecting on the events unfolding, and the trial judge and both counsel held an _in camera_ discussion concerning the South Tower of the World Trade Center, which collapsed at 9.59 a.m. Immediately thereafter, the trial judge informed, in Petitioner's presence, the selectees and the remainder of the _venire_ persons that one of the World Trade Center towers had collapsed and that the Pentagon had been attacked.  In conjunction with that announcement, the trial judge inquired whether any selectee or _venire_ person awaiting _voir dire_ had relatives or friends in the World Trade Center or in the Pentagon.[8]

---

[8]  In response, some already-impaneled selectees stated relevant concerns and were excused, either on September 11, or on the third day of _voir dire_, that is, on September 13.

At mid-day, a half-hour recess was allowed by the trial judge, so those who were worried about their family members and friends could reach out and make sure their loved ones were safe. It was during that recess, when the trial judge learned that the Passaic County courthouse complex, as all other judicial and state offices in New Jersey, were ordered closed due to the World Trade Center and Pentagon events, and the crash of the hijacked jet in Pennsylvania.  By that time, twenty-nine venire persons were voir dired in open court.  Of these twenty-nine, six were subjected to supplemental interviews in camera.  Out of those six, four were dismissed for cause, while two were dismissed upon exercise of peremptory challenges.  Thus, none of the venires questioned in camera on September 11 was impaneled on Petitioner's jury.

### c.   September 12, 2001

The Passaic County courthouse was closed.  No voir dire proceedings took place.

### d.   September 13, 2001

The voir dire proceedings resumed.  The trial judge, realizing the gravity and the impact of the September 11 events and, specifically, the fact that many people were so affected by those events that they might have problem serving on the jury, made an in-court statement clarifying that he would entertain the selectees and venire persons' every request to talk to him and

14

the attorneys.  To narrow the pool of venires to those persons
who did not have apparent September-11-tragedy-based problems
preventing their service on the jury, the trial judge began pre-
screening the entire pool of venire persons, who were not yet
assigned a prospective juror number, in camera, formally
verifying, in the midst of that pre-screening process, that
Petitioner's counsel had no objection to this process.
(Petitioner's counsel expressly confirmed lack of objections.)
Out of twenty-two so-pre-screened venires, eighteen were excused,
while the remaining four underwent a following full voir dire in
open court, that is, in Petitioner's presence.

This last day jury selection process proved particularly
complex logistically, since it was affected by at least one
evacuation of the entire courthouse (resulting from what appeared
to be a bomb threat).[9]

Petitioner's jury was fully selected by close of business.

### 4.  Individual Venire Persons[10]

_____

[9]  Petitioner is of impression that he was removed from the
court no less than three times and returned to Passaic County
Jail, instead of being moved to a holding cell in the courthouse.
Although this Court is not entirely clear as to how such
transfers could have been possible, in terms of the time
constraints, this aspect has no bearing on the analysis at hand.

[10]  As noted supra, the following summary traces the
developments that took place over the entire three days voir
dire.  Hence, numerous venire persons who were not excused prior
to the September 11 tragedy were, nonetheless, excused post-
tragedy, since the events of September 11 amplified their
personal and/or employ-related problems to such level that the

### a.   Chain of <u>Venire</u> Persons Yielding Juror # 1

- Robert Brown, acting as the first prospective juror # 1, was initially impaneled but was eventually excused and did not serve on Petitioner's jury.  Thus, his post-September 11 <u>in camera</u> statements are of no relevance to the inquiry at bar.[11]  Upon his excuse, he was substituted by Martha Farmiga.

- Martha Farmiga, acting as the second prospective juror # 1, was selected as a member of Petitioner's jury.  Although she stated that her house was broken into about twenty years prior to Petitioner's trial, that statement was offered in open court and, thus, could not raise any right-to-presence concerns.

### b.   Chain of <u>Venire</u> Persons Yielding Juror # 2

- Regina Somma, acting as prospective juror # 2, was impaneled as a member of Petitioner's jury.  Her questioning did not

---

trial court found excusing them warranted.

[11]  Petitioner's Ground One position is limited to the claim that some jurors, who were in fact impaneled, should *not* have been on the jury.  In other words, Petitioner maintains that his rights were violated because, had he partaken in side-bar and/or <u>in camera</u> conferences, the jurors who were actually impaneled would not be on his jury.  Correspondingly, the issue of why some <u>venire</u> persons were excused, rather than impaneled, falls outside the scope of Petitioner's Ground One.  Correspondingly, all <u>in camera</u> statements made by those <u>venire</u> persons who were not impaneled is of no relevance to the inquiry at hand.

raise any concerns.[12]

### c.   Chain of <u>Venire</u> Persons Yielding Juror # 3

- Anthony Mayer, acting as the first prospective juror # 3, was not impaneled, but his questioning did not raise any concerns.  He was substituted by Eric Monroe.

- Eric Monroe, acting as the second prospective juror # 3, was also not impaneled.  His questioning, too, did not raise any concerns.  He was substituted by Mary Patterson.

- Mary Patterson, acting as the third prospective juror # 3, was analogously not impaneled.  Her questioning also did not raise any concerns.  She was substituted by Brian Eitel.

- Brian Eitel, acting as the fourth prospective juror # 3, was impaneled as a member of Petitioner's jury.  Although he stated that he had acquaintances in law enforcement, that statement was made in open court, in Petitioner's presence and could not raise any right-to-presence concerns.

### d.   Chain of <u>Venire</u> Persons Yielding Juror # 4

- Juliana Brown, acting as the first prospective juror # 4, was excused after she stated her belief that her sibling

---

[12]   The Court's resort to the phrase "did not raise any concerns" (or analogous phraseology) indicates that: (a) neither Petitioner's appointed counsel nor Respondents reflected on the statements made by the particular venire person; and (b) this Court's examination of <u>voir dire</u> transcript did not indicate a statement warranting a discussion in this Opinion.

might have been criminally prosecuted.  She was substituted by James Simpson.

- James Simpson, acting as the second prospective juror # 4, was also not impaneled.  His responses provided in open court resulted in further <u>in camera</u> questioning, where he stated that he was familiar with the case after reading a newspaper article.  He was removed upon Petitioner's counsel's exercise of a peremptory challenge.  Thus, his <u>in camera</u> statements are of no relevance to the Court's inquiry at hand.  He was substituted by Matthew Zimmer.

- Matthew Zimmer, acting as the third prospective juror # 4, was impaneled as a member of Petitioner's jury.  Although he acknowledges that he was a member of a certain grand jury panel and had acquaintances in the police force, those statements were made in open court.  Thus, they could not raise any right-to-presence concerns.

### e.   Chain of <u>Venire</u> Persons Yielding Juror # 5

- Karen Challice, acting as the first prospective juror # 5, made in-court statements about her husband's employ as a police officer and offered an unsolicited praise to one of Petitioner's arresting officers.  Those statements resulted in her disqualification.  She was substituted by Fred Nazare.

18

- Fred Nazare, acting as the second prospective juror # 5, made in-court and in camera statements reflecting on the issues of his employment situation and the likely length of the trial.  Since he was not impaneled, these statements are of no relevance to the Court's inquiry at hand.  He was substituted by Liliethia Johnson.

- Liliethia Johnson, acting as the third prospective juror # 5, made an in-court statement indicating that she knew a witness in Petitioner's case.  She was excused and substituted by Wilsonia Thomas.

- Wilsonia Thomas, acting as the fourth prospective juror # 5, was impaneled as a member of Petitioner's jury.  Her questioning did not raise any concerns.

### f.   Chain of <u>Venire</u> Persons Yielding Juror # 6

- Phyllis Hanrahan, acting as the first prospective juror # 6, stated in-court that her employer would be displeased with her long absence due to the trial and got excused.  She was substituted by Joseph Feliciano.

- Joseph Feliciano, acting as the second prospective juror # 6, was peremptory challenged and removed.  He was substituted by McArthur Williams.

- McArthur Williams, acting as the third prospective juror # 6, was analogously peremptory challenged and removed.  He was substituted by Gregory Gunther.

19

- Gregory Gunther, acting as the fourth prospective juror # 6, made an in camera statement confessing his inability to be an impartial juror and was excused.  He was substituted by John Pescatore.

- John Pescatore, acting as the fifth prospective juror # 6, was impaneled as a member of Petitioner's jury.  He made two in camera statements.  One related to his family member, who was a firefighter missing after the September 11 tragedy (and whose funeral Pescatore feared he had to attend); the trial court declined excusing Pescatore on that ground due to the speculative nature of his fears.  The second in camera statement indicated that Pescatore had an uncle who was criminally prosecuted in error and who, eventually, got the record of that prosecution expunged.

### g.   Chain of **Venire** Persons Yielding Juror # 7

- Cindy Woods, acting as the first prospective juror # 7, was excused.  She was substituted by Peroida Torres.

- Peroida Torres acted as the second prospective juror # 7.  She, too, was excused; she was substituted by Pamela Mossa.

- Pamela Mossa, acting as the third prospective juror # 7, was also not impaneled.  Although she stated, in camera, that her father was injured as a result of a robbery, she was peremptorily challenged by Petitioner's counsel and removed.  She was substituted by Irlanda Velasquez.

20

- Irlanda Velasquez, acting as the fourth prospective juror # 7, was, too, not impaneled.  Her _in_ _camera_ statements related to her employment situation, while her statements made in open court disclosed that her family member was a probation officer.  She was also peremptorily challenged by Petitioner's counsel and removed.  She was substituted by Beverly Dargis.

- Beverly Dargis, acting as the fifth prospective juror # 7, was also not impaneled.  Her _in_ _camera_ statements indicated that her son was scheduled to undergo juvenile proceeding the next day in the same court.  She was peremptorily challenged by the State and removed, being substituted by Wayne Vanostenbridg.

- Wayne Vanostenbridg, acting as the sixth prospective juror # 7, was not impaneled either, being removed upon the State's challenge.  He was substituted by Jacqueline Vasquez.

- Jacqueline Vasquez, acting as the seventh prospective juror # 7, was also not impaneled.  She made two _in_ _camera_ statements, one reflecting on her financial concerns and another disclosing that she had a family member employed as a probation officer.  She was removed upon Petitioner's defense counsel's peremptory challenge and substituted by Robert Doormany.

21

- Robert Doormany, acting as the eighth prospective juror # 7, was analogously not impaneled as a member of Petitioner's jury.  While his in camera statements raised no concerns, his statements made in open court indicated that his judgment was likely to be affected by a certain prior criminal act.  Therefore, he was excused and substituted by Miguel Lugo.

- Miguel Lugo, acting as the ninth prospective juror # 7, was too not impaneled as a member of Petitioner's jury, since his in-court statements prompted Petitioner's counsel to exercise a peremptory challenge.  He was substituted by Scott Suralik.

- Scott Suralik, acting as the tenth prospective juror # 7, was also not impaneled as a member of Petitioner's jury.  After Suralik declared in open court that he could not be impartial, the trial judge excused him.  He was substituted by Gregory Curry.

- Gregory Curry, acting as the eleventh prospective juror # 7, was impaneled to sit as a member of Petitioner's jury.  In his in camera statement, Curry disclosed that he had a relative who was criminally prosecuted and held in custody, being seemingly a pre-trial detainee.

### h.   Chain of **Venire** Persons Yielding Juror # 8

- Cecil Matthews, acting as the first prospective juror # 8, stated in court that his long absence due to the trial would result in lay-off of his colleagues and was excused.  He was substituted by William Larrinaga.

- William Larrinaga acted as the second prospective juror # 8. He was excused and substituted by Alice Stanley.

- Alice Stanley, who acted as the third prospective juror # 8, was impaneled to sit as a member of Petitioner's jury.  Her statements were made in open court, indicating her concerns about family member with mental incapacity; she also disclosed that she served on jury in manslaughter, murder, and drug cases.  In addition, she disclosed that her other family member's house had been robbed, and that her friend's spouse was a retired police captain.  All these statements were made in open court and could not raise any right-to-presence concerns.

### i.   Chain of **Venire** Persons Yielding Juror # 9

- Rebecca Bertram, acting as the first prospective juror # 9, was impaneled as a member of Petitioner's jury.  Her questioning did not raise any concerns.

### j.   Chain of **Venire** Persons Yielding Juror # 10

- Bruce Demore, acting as the first prospective juror # 10, was excused.  He was substituted by Diane Butler.

- Diane Butler acted as the second prospective juror # 10. She was impaneled as a member of Petitioner's jury.  Being pre-screened <u>in</u> <u>camera</u> and, later on, additionally questioned <u>in</u> <u>camera</u>, she made the same statements as those she made later in open court, <u>i.e.</u>, she reflected on her concerns about her employ.

          **k.   Chain of <u>Venire</u> Persons Yielding Juror # 11**

- Jose Jiminez, acting as the first prospective juror # 11, made in-court statements asserting financial hardship associated with the length of the trial and followed the same with an <u>in</u> <u>camera</u> clarification that financial considerations were paramount to him because he was supporting his sick wife in a foreign country.  He was not impaneled, being substituted by Albert Campbell.

- Albert Campbell, acting as the second prospective juror # 11, was also excused.  He was substituted by Celia Smith.

- Celia Smith acted as the third prospective juror # 11.  She was impaneled as a member of Petitioner's jury.  Being pre-screened <u>in</u> <u>camera</u>, she made no statements related to her ability or inability to be an impartial juror.  Later on, in open court, she disclosed that her former spouse was a criminal defendant represented by Petitioner's defense counsel.  That in-court statement, however, could not raise any right-to-presence concerns.

### 1.   Chain of __Venire__ Persons Yielding Juror # 12

- Ruth McKoy, acting as the first prospective juror # 12, stated in-court that she had knowledge of the case; that response resulted in her being questioned in camera.  There, she detailed her familiarity with the families of the victim and one of the witnesses.  She was not impaneled, being substituted by Andrew Kadin.

- Andrew Kadin, acting as the second prospective juror # 12, was excused for reasons associated with the September 11 tragedy, which he disclosed in open court.  He was substituted by Rajesh Mehta.

- Rajesh Mehta, acting as the third prospective juror # 12, was excused in light of the concerns caused by the fact of his self-employ.  He was substituted by Damian Navarette.

- Damian Navarette, acting as the fourth prospective juror # 12, first made in camera statements reflecting on the unique demands and responsibilities of his employ; he then recited the same in open court.  He was removed upon the State's election to exercise a peremptory challenge, being substituted by George Golflech.

- George Golflech acted as the fifth prospective juror # 12. He made in-court statements disclosing his propensity to accept police officers' statements as true and, thus, was excused.  He was substituted by Wayne Bush.

- Wayne Bush, acting as the fifth prospective juror # 12, made in-court and <u>in</u> <u>camera</u> statements.  The former indicated that he had acquaintances in law enforcement, while his <u>in</u> <u>camera</u> statements disclosed that his son was charged with a criminal offence and sentenced to probation.  He was removed upon Petitioner's counsel's election to exercise a peremptory challenge, being substituted by Christine Elliot.

- Christine Elliot, acting as the sixth prospective juror # 12, also made in-court and <u>in</u> <u>camera</u> statements.  In court, she indicated that her daughter was a victim of mugging; <u>in</u> <u>camera</u>, she disclosed that her ex-spouse was charged with an aggravated manslaughter, and that she had been a victim of domestic violence.  Those statements caused Petitioner's counsel to exercise a peremptory challenge, and Elliot was removed.  She was substituted by Maureen O'Farrill.

- Maureen O'Farrill, acting as the seventh prospective juror # 12, was impaneled as a member of Petitioner's jury.  <u>In</u> <u>camera</u>, she made a statement indicating that her son was charged with and convicted on drug-related offenses.

  **m.   Chain of <u>Venire</u> Persons Yielding Juror # 13**

- Frederick Ackerly, acting as prospective juror # 13, provided in-court testimony that raised no concerns.  He was, therefore, impaneled as a member of Plaintiff's jury.  However, two days after that impaneling, that is, on

26

September 13, he made a number of statements in camera.
Specifically, he stated that he had spoken to his mother,
who reminded him certain facts that, initially, escaped his
recollections.  Those facts included: (i) him being a
juvenile criminal defendant in a proceeding that, seemingly,
yielded no prison term; (ii) his friend being arrested,
prosecuted and convicted on murder charges that yielded a
twenty-five-year prison term; and (iii) his uncle being
erroneously charged with a criminally offense (the record of
that offense was eventually expunged).  Having reiterated
his certainty as to his ability to act as an impartial
juror, Ackerly remained on the jury.

### n.    Chain of Venire Persons Yielding Juror # 14

- Kenneth Bergen, acting as prospective juror # 14, was
  impaneled as a member of Petitioner's jury.  His questioning
  did not raise any concerns.

### 5.    In Camera Statements by Impaneled Jurors

As the foregoing illustrates, Petitioner's counsel actively
challenged venire persons, peremptorily and for cause, on the
basis of statements the venires made in open court and in camera.
Those venires who: (i) made in camera statements; and yet (ii)
were impaneled, provided information either suggesting their
inclination to be sympathetic to Petitioner or having, seemingly,
no direct impact on their ability to be impartial.  Specifically:

- Pescatore's <u>in</u> <u>camera</u> statement indicated that his uncle was criminally prosecuted in error and had to get his record expunged.

- Curry's <u>in</u> <u>camera</u> statement indicated that he had a relative who was, at that time, criminally prosecuted and held in custody.

- Butler's <u>in</u> <u>camera</u> statement reflected solely on her concerns about employ.

- O'Farrill's <u>in</u> <u>camera</u> statement indicated that her son was convicted on drug-related offenses.

- Ackerly's <u>in</u> <u>camera</u> statements disclosed his own juvenile criminal conviction, his friend's adult conviction on murder charges, and his uncle's erroneous prosecution which, too, necessitated expungement of the record.

**V.    WAIVER ASPECT**

    **A.    <u>Respondents' Latest Legal Position</u>**

Respondents, in their supplement (filed by Respondents' current counsel) raised an aspect not asserted in their original answer and re-brief (filed by Respondents' original counsel). Specifically, Respondents now hold the position that Petitioner's Ground One challenges do not warrant habeas relief because he implicitly waived his objections to being present at side-bar and <u>in</u> <u>camera</u> portions of his <u>voir</u> <u>dire</u>.

### 1.  Factual Predicate Relied Upon by Respondents

Respondents' current position could, effectively, be reduced to an argument that "Petitioner [is, now,] essentially playing 'Monday morning quarterback,'" <u>Wester v. Ricci</u>, 2011 U.S. Dist. LEXIS 80246, at *23 (D.N.J. July 22, 2011) (citations and original brackets omitted).  Specifically, Respondents point out that, in his counseled direct appellate brief filed with the Superior Court of New Jersey, Appellate Division, as well as in his two <u>pro se</u> supplements to the same, and in his counseled application for certification to the Supreme Court of New Jersey (and in his two <u>pro se</u> supplements to that filing), Petitioner did not raise any challenges based on his <u>voir dire</u> proceeding, <u>see</u> Docket Entry No. 42, at 16-17 (elaborating on the same in great detail and citing to Docket Entries Nos. 39-1 to 39-5), and asserted his first jury-selection-based challenge, which was different from the Ground One at bar, only in his application for post-conviction relief ("PCR") filed three years after his conviction.[13]  <u>See</u> <u>id.</u> at 19-20.

---

[13]  In that PCR application, Petitioner asserted that he "was not involved in the selection process and parts of the <u>voir dire</u> took place in chambers outside his presence [therefore,] several jurors were impaneled [even though he would have preferred to] have [them] excluded because of their criminal victimization had relative in law enforcement or other potential bias."  Docket Entry No. 42, at 21 (quoting Docket Entry No. 39-8); <u>accord</u> Docket Entry No. 39-10 (stating effectively the same).

The trial court conducted a hearing, the record of which contains the following exchange between Petitioner and his trial judge:

Petitioner:     I sat at the defense table writing notes down and telling my lawyer certain things that he didn't even bring to the Court's attention, he just ignored me.  I asked him could I personally be there . . . in chambers, [and] at sidebar, and he just ignored what I told him.  I asked him to remove juror number 11 and he just ignored what I told him.[14]  I wasn't saying any of these things verbally but I just jotted them down as notes and [was] sliding the paper over to him.  He just ignored everything I [wrote to] him.

Trial court:    [Did] you ever bring any of that to my attention during the course of the trial?

Petitioner:     To your attention?  [No.]  At the time I didn't know, I was very incompetent to the law, I didn't know . . . I would waive my right.

                . . .

                I had no idea at all that he waived my appearance way back then.  After, after I actually asked him could I be present.  There was numerous jurors on the bench that I actually wanted excluded due to the fact they had, you know, recent victimized, you know, been recent victims of crime and I'm sitting on trial for a robbery homicide and - and 80 percent of my jury has been affected . . . .

Trial court:    Eighty percent?

Petitioner:     I'm just saying if it's 12 on there after the two alternatives were taken off, at least

---

    [14]  Petitioner was referring to Celia Smith who stated, in open court, that her former spouse was a criminal defendant represented by Petitioner's defense counsel.

30

> seven of them.  At least seven of them either
> had their homes broken into, they been robbed
> or they family been robbed or something
> dealing with robbery or burglary or
> something.[15]

Docket Entry No. 29-6, at 12, 16.

Addressing Petitioner's _voir dire_ challenges, the trial

court ruled:

> Petitioner contends that his constitutional rights were
> violated when portions of the jury _voir dire_ took place
> in chambers outside his presence. . . .  However, the
> [relevant law] provides that . . . this right is not
> absolute and may be waived by a defendant.  . . . [The]
> New Jersey Supreme Court expressly addressed the issue
> of whether a defendant must affirmatively assert a
> right to sidebar presence or be deemed to have waived
> it.  The Court held that, a defendant who does not
> affirmatively request the right to participate in _voir
> dire_ sidebars should be considered to have waived the
> right . . . .  Here, the record does not reflect nor
> does the Petitioner suggest that he ever affirmatively
> requested to be present during the portions of the jury
> _voir dire_ that took place in chambers. As a result, the
> Petitioner is deemed to have waived that right.

Docket Entry No. 29-7, at 27.[16]

### 2.   Respondents' Conclusions and Petitioner's Position

---

[15]   It appears that Petitioner was referring solely to the
statements made in open court, since the _voir dire_ record does
not indicate that any impaneled juror made an _in camera_ statement
about him/her being victim of a violent crime or any crime.

[16]   It appears that Petitioner's PCR appellate filings,
which included a counseled brief and two _pro se_ applications, did
not raise a _voir dire_ challenge, _see_ State v. Williams, 2008 WL
4345452, at *3-4 (listing all Petitioner's appellate PCR
challenges); rather, he noted his _voir dire_ claim only in his _pro
se traverse_ to the State's opposition filed on appeal.  _See_
Docket Entry No. 39-13, at 11-14 (relying on state law).

Respondents' supplement to re-brief builds on the position taken by the state courts, focusing solely on the waiver aspect.[17]  Respondents' legal position is presented as a survey of the law of waiver, as it was tackled in federal and state fora. Specifically, Respondents' point out that:

a.  New Jersey state courts found implied waiver where a criminal defendant did not seek being present during side-bar and/or in camera portions of voir dire, holding that such implied waiver could be negated only if the presiding judge actively discourages the defendant from exercising his right to presence.  See Docket Entry No. 1, at 32-33 (detailing the procedural history, facts and holding of State v. W.A., 184 N.J. 45 (2005));

b.  federal courts, including circuit courts, analogously held that failure to actively assert one's right to presence yields an implied waiver.  See id. at 33-34 (citing Cardinal v. Gorczyk, 81 F.3d 18 (2d Cir. 1996), and United States v. Sherwood, 98 F.3d 402 (9th Cir. 1996), and discussing United States v. Washington, 705 F.2d 489 (D.C. Cir. 1983), at

---

[17]  To Respondents' credit, Respondents outright announced their change in legal position.  See Docket Entry No. 42, at 1. The fact of Respondents' current counsel being forthcoming with the Court is, indeed, commendable.  However, Respondents' election not to address the issue directed for supplemental re-briefing is regretful, notwithstanding the excellent examination of Respondents' waiver-based position.

length, as well as the <u>Washington</u> court's reliance on <u>United</u> <u>States v. Ridley</u>, 412 F.2d 1128 (D.C. Cir. 1983));[18]

c.   the Supreme Court of the United States recognized, if not <u>de</u> <u>facto</u> endorsed, implied waiver of the right to presence in <u>United States v. Gagnon</u>, 470 U.S. 522 (1985), since the Court's ruling hinged on the unique facts of <u>Gagnon</u> which, effectively, precluded any possibility of implied waiver. <u>See</u> Docket Entry No. 1, at 35-37 (providing a careful and thoughtful discussion of <u>Gagnon</u>); and

d.   the Court of Appeals for the Third Circuit issued a number of decisions well in line with <u>Gagnon</u> and the conclusions reached by other federal courts, by invariably finding that the failure of a criminal defendant to *actively and contemporaneously* assert his/her right to presence with regard to side-bar and/or <u>in</u> <u>camera</u> portions of <u>voir</u> <u>dire</u> proceeding results in an implied waiver.  <u>See</u> <u>id.</u> at 37-39 (discussing <u>United States v. Bertoli</u>, 40 F.3d 1384 (1994) (where the Court of Appeals observed that, under "[the] contemporaneous objection rule, [a criminal defendant's] failure contemporaneously to assert a right constitutes a waiver of [the] right" in light of <u>Gagnon</u> and the holding of

---

[18]   The <u>Washington</u> court examined an unusual twist on an implied waiver, <u>i.e.</u>, it addressed the position that a criminal defendant might still implicitly waive his right to presence even if the defendant's counsel makes a request for the defendant's presence in side-bar conferences.

United States v. Brown, 923 F.2d 109, 112 (8th Cir.) (one's right to presence during the in camera portions of jury selection is deemed waived by failure to actively and contemporaneously assert that right), cert. denied, 502 U.S. 833 (1991)), and citing United States v. Alessandrello, 637 F.2d 131 (3d Cir. 1980)).[19]

Upon so surveying the above-cited decisions, Respondents enter their position that Petitioner's Ground One merits no habeas relief because: (a) Petitioner had abundant time and a multitude of ample opportunities to request his trial judge to include him in in camera and side-bar portions of the voir dire; (b) the voir dire record is unambiguous as to Petitioner silence with regard to his right to presence, and Petitioner does not dispute the same; and (c) Petitioner's defense counsel, being asked on the record by the trial judge as to any objections, expressly stated that there were no objections to how the voir dire process was performed.[20]

Petitioner's counseled position focused, mainly, on the core question posed by this Court (that is, the below-discussed issue

---

[19]   The Alessandrello decision, however, appears more pertinent to the question posed by the Court in connection with its order to file supplemental re-briefs.  Therefore, it will be discussed in the next part of this Opinion.

[20]   In alternative, Respondents asserts that, even if Petitioner's trial court committed an error, that error was harmless.

of whether Petitioner's absence at the side-bar and in camera
conferences violated his rights) and, for the purposes of the
waiver inquiry, could effectively be reduced to: (a) a
reiteration of the undisputed fact that Petitioner made no
express waiver on the record; and (b) arithmetical calculation
and statistical analysis of all statements made in camera, even
if those statements were made by the jurors who were excused
during post-September-11 pre-screening, or excused in connection
with personal post-September-11 hardships conveyed to the trial
judge outside such pre-screening, or the jurors who were removed
for cause or peremptorily, and even the statements made in camera
by the trial judge and the attending counsel on both sides.[21]
See, generally, Docket Entries Nos. 30 and 38.

Petitioner's supplement to the briefs filed by his appointed
counsel, as well as Petitioner's two supplements volunteered in
lieu of his counseled traverse, asserted a legal argument
mirroring that raised during his PCR proceedings, i.e.,
Petitioner maintained that he could not have entered an implied
waiver because, at the time of his voir dire proceedings, he was:
(a) neither expressly warned that his failure to raise the issue
with his trial judge would amount to such implied waiver; nor (b)

---

[21]  Since it is equally undisputed that Petitioner made no
request for presence on the record, Petitioner's counseled
position is inapposite to the implied waiver inquiry.

35

was he as knowledgeable about law as he believes he is now. <u>See</u>, <u>generally</u>, Docket Entries Nos. 22, 44 and 46.

**B.   <u>Respondents' Position Is Well Merited</u>**

Respondents' position, being exhaustively detailed in their supplement, Docket Entry No. 42, sufficiently establishes that Petitioner's right to presence was implicitly waived in light of Supreme Court and inferior-level precedent.  There is no reason for this Court's reiteration of the same. However, two additional observations appear warranted.

**1.   Reliance on <u>Gagnon</u>, Circuit-Level and State Law**

The holding of Supreme Court's decision in <u>Gagnon</u> was *not* rendered on the factual predicate materially indistinguishable from the facts at bar: as Respondents detailed, the facts of <u>Gagnon</u> were, in many respects, virtually opposite.  Hence, the <u>Gagnon</u> Court's acknowledgment of implied waiver was <u>dictum</u>.  That adds a wrinkle to this Court's inquiry, since circuit-level decisions and New Jersey Supreme Court's rulings cited by Respondents cannot operate as a substitute for Supreme Court precedent.  <u>See Yarborough</u>, 541 U.S. at 660.  That being said, Respondents' position, which relies on circuit-level and state law precedent, and builds on the overall rationale of <u>Gagnon</u>, is appropriate.

A district court sitting in habeas review may consider circuit-level and highest state courts' decisions since such

determinations "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." Hill v. Hofbauer, 337 F.3d 706, 716 (6th Cir. 2003); see also Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999) ("in certain cases it may be appropriate to consider the decisions of inferior-level federal courts as helpful amplifications of Supreme Court precedent").  Therefore, Respondents' reliance on the Court of Appeals' precedent in Bertoli, 40 F.3d 1384, and Brown, 923 F.2d 109, as well as on Second and Ninth Circuits' decisions in Cardinal, 81 F.3d 18, and Sherwood, 98 F.3d 402, and on New Jersey Supreme Court's ruling in W.A., 184 N.J. 45, was appropriate.  See Williams, 529 U.S. at 407 (where a Supreme Court holding espouses merely a general standard, circuit court precedent is helpful in illuminating and interpreting that general standard to particular factual circumstances and providing evidence of the clarity of the law).

Additionally, a habeas ruling does not necessarily turn on a factually identical Supreme Court precedent.  "Rather, the critical question is whether a Supreme Court rule -- by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant

factual situations -- can fairly be said to require a particular result in a particular case." Matteo, 171 F.3d at 888 (citation omitted).  Therefore, Respondents' reading of Gagnon as precedent providing "a channeled mode of analysis" for assessment of Petitioner's three-day silence throughout the entire voir dire process, was appropriate.  In fact, the Court of Appeals recently entered a decision employing a mode of analysis analogous to that utilized by Respondents.  See United States v. Johnson, 677 F.3d 138 (3d Cir. 2012).

In Johnson, a convicted criminal defendant asserted that the district court's "individual voir dire procedure violated his constitutional rights" because the judge was "questioning prospective jurors at sidebar outside his presence." Id. at 140-41.  Specifically,

> [during] jury selection, the District Court followed the customary procedure of questioning prospective jurors first in open court and later individually at sidebar. Johnson remained at the defense table during the sidebar proceedings, which were on the record.  The District Court ruled on challenges for cause at sidebar, and thereafter counsel returned to their tables to mark their peremptory challenges.

> [On the basis of these facts,] Johnson [argued] that this procedure violated his constitutional right to be present at all stages of his trial.  [The Court of Appeals disagreed pointing out that] neither Johnson nor his counsel objected to the procedure during jury selection, even when [the district court asked whether there were objections].  The decision not to object to voir dire conducted at sidebar and outside the presence of the defendant [was] a tactical decision similar to the one at issue in Gonzalez v. United States, 553 U.S. 242 (2008).  In Gonzalez, the Supreme Court held that

38

"express consent by counsel suffices to permit a
magistrate judge to preside over jury selection in a
felony trial." Id. at 250.  Noting that "acceptance of
a magistrate judge at the jury selection phase is a
tactical decision that is well suited for the
attorney's own decision," the Court explained that

> [a] magistrate judge's or a district judge's
> particular approach to voir dire both in substance
> -- the questions asked -- and in tone -- formal or
> informal -- may be relevant in light of the
> attorney's own approach.  The attorney may decide
> whether to accept the magistrate judge based in
> part on these factors.  As with other tactical
> decisions, requiring personal, on-the-record
> approval from the client could necessitate a
> lengthy explanation the client might not
> understand at the moment and that might distract
> from more pressing matters as the attorney seeks
> to prepare the best defense.

Id.

An attorney's obligation to consult with his client
"does not require counsel to obtain the defendant's
consent to 'every tactical decision.'" Florida v.
Nixon, 543 U.S. 175, 187 (2004) (quoting Taylor v.
Illinois, 484 U.S. 400, 417-18 (1988)).  As with the
choice to proceed before a magistrate judge during voir
dire, the decision to have a criminal defendant present
-- and in close proximity to individual jurors --
during individual voir dire conducted at sidebar is
tactical and does not require the defendant's express
consent.  Like counsel in Gonzalez, Johnson's lawyer
consented to the jury selection procedures and thereby
waived his client's right to challenge them.  See
United States v. Sherwood, 98 F.3d [at] 407 . . .
("Sherwood waived his right to be present during the
attorney-conducted voir dire at sidebar] by failing to
indicate to the district court that he wished to be
present at side bar"); Cardinal v. Gorczyk, 81 F.3d
[at] 20 . . . ("Cardinal waived his Sixth Amendment
right to observe the individual voir dire by failing to
assert that right") . . . .

Johnson, 677 F. 3d at 141-42; accord Williams v. State, 438 A.2d

1301, 1308-09 (Md. 1981) (establishing prospective rule that

defendant's right to be present can be waived by action or inaction of counsel).

Hence, while Respondents' argument might have been stronger had it read Bertoli, Brown, Sherwood, Cardinal and W.A. in light of Gonzalez, Nixon and Taylor, rather than correlating those decisions to Gagnon, Respondents' reading of these circuit-level opinions as interpretations of the overall analytical model offered by the Supreme Court (which model was applied in Gagnon) provides sufficient support to Respondents' position.[22]

This Court, therefore, agrees that Petitioner's invariable three-days silence resulted in an implied waiver.

### 2. Petitioner's Lack-of-Legal-Savvy Position

Petitioner attempted to distinguish his circumstances from those examined in the above-discussed decisions by asserting that, at the time of his voir dire, he "was very incompetent to the law, [and] didn't know [he] would waive [his] right [to presence]." Docket Entry No. 29-6, at 12; accord Docket Entries Nos. 22, 44 and 46. Petitioner, seemingly, tried to buttress the same by alleging that, during the voir dire, he was passing his

---

[22] The Court notes, in passing, that some cases related to the analysis at hand focused on Rule 43 of the Federal Rules of Criminal Procedure. However, as the Court already explained, the precedents reflecting on Rule 43 are constructions of constitutional safeguards, since the Rule, on its own, was a partial embodiment of the Constitution and prior Supreme Court precedent. See Williams v. Ricci, 2011 U.S. Dist. LEXIS 51959, at *19-20 (D.N.J. May 13, 2011).

counsel written notes where, in alternation with directives to obtain dismissal for cause or peremptorily challenge certain venire persons, he also requested to be present at side-bar and in camera conferences.  See id.

Petitioner's position is unavailing.  "What suffices for waiver depends on the nature of the right at issue . . . .  For certain fundamental rights, the defendant must personally make an informed waiver.  For other rights, however, waiver may be effected by action of counsel."  New York  v. Hill, 528 U.S. 110, 114 (2000) (citations omitted).  As the Court of Appeals explained in Johnson, 677 F. 3d at 142, decisions pertaining to the conduct of the trial belong to the attorney, see also Hill, 528 U.S. at 114, as do those that "concern strategic and tactical matters."  United States v. Plitman, 194 F.3d 59, 63 (2d Cir. 1999).  Hence, even if this Court were to credit Petitioner's assertion that some of Petitioner's written notes passed to his defense counsel contained requests to be present during side-bar conferences and in camera questioning, those notes did not strip Petitioner's counsel of the right to decide this tactical issue.

Analogously, Petitioner's claim that his implied waiver could not have been entered because, at the time of his voir dire, he had less legal savvy than he believes he has now, is without merit.  As the Court of Appeals' explained in Bertoli, 40 F.3d 1384, while relying on Brown, 923 F.2d at 112, an implied

41

waiver comes about if a criminal defendant fails to *actively and contemporaneously* state his/her objections to the presiding court.  The defendant's legal savvy is not factored into that equation since the consequences of his/her silence immediately put the defendant on notice as to the workings of the waiver.

While there is no dispute that a waiver of one's constitutional right must be informed, knowing and voluntary, <u>see United States v. Brady</u>, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights . . . must be voluntary [and] knowing, intelligent acts"), the rationale of that rule turns on the goal of ensuring the litigants "sufficient awareness of the . . . likely consequences." <u>Id.</u>  For instance, an alien defendant's waiver of his right to trial by jury (and acceptance of a guilty plea upon advice of counsel who omits to inform the alien that, years in the future and after the alien's prison term is served, the criminal charge he/she pled to might result in deportation) cannot be voluntary, knowing and intelligent if, at the time of the plea, there is nothing to warn the alien of such future risk. See <u>Padilla v. Kentucky</u>, 130 S. Ct. 1473, 1476-77, 1486 (2010). That is why, a waiver so deficient warrants habeas relief: the alien lacks "sufficient awareness of the likely consequences." <u>Brady</u>, 397 U.S. at 748; <u>accord</u> <u>Padilla</u>, 130 S. Ct. at 1487.

In contrast, the consequences of a criminal defendant's waiver of his/her right to presence do not develop years in the

future: these consequences are, by definition, immediate.  Here, Petitioner physically witnessed his trial judge conducting side-bar conferences and taking prospective jurors for <u>in</u> <u>camera</u> examinations.  Yet, hour after hour, and day after day, he remained invariably silent.  He saw the immediate effect of his silence materializing in front of his eyes, when some <u>in</u>-<u>camera</u>-questioned jurors were, in fact, getting impaneled.  Therefore, he needed no legal savvy to appreciate what was taking place: the developments he was witnessing were putting him on notice about the consequences of his silence "in real time."

Hence, Petitioner cannot viably claim he did not know he was waiving his right to presence.  While his waiver was implied, it was unambiguous.  <u>See</u> <u>Cohen v. Senkowski</u>, 290 F.3d 485, 491-92 (2d Cir. 2002) ("a defendant may expressly or effectively waive the right") (citation omitted); <u>United States v. Riddle</u>, 249 F.3d 529, 533-34 (6th Cir. 2001) (declining to require colloquy of defendant before voluntary absence from <u>voir</u> <u>dire</u>).

### 3.  Dismissal of the Ground One on the Waiver Basis

As this Court noted at the outset of its discussion, for the purposes of § 2254(d)(1), an "unreasonable application" of Supreme Court precedent can arise in two ways: either the state court identifies correct Supreme Court precedent but unreasonably applies it to facts of particular state prisoner's case, or the state court unreasonably extends legal principle from Supreme

Court precedent to new context where that principle should not apply (or unreasonably refuses to extend that principle to new context where it should apply). See, e.g., Swartz v. Mathes, 291 F. Supp. 2d 861 (N.D. Iowa 2003) (reflecting on the same at length), aff'd, 412 F.3d 1008 (8th Cir. 2005).

Here, the state courts' decisions did not endeavor to identify the governing Supreme Court precedent. Rather, the state courts dismissed Petitioner's right-to-presence challenges relying predominantly on state law, which had been fashioned to accord with the gist of Gagnon and Gonzalez. Therefore, the appropriate analysis is whether the state court unreasonably extended the overarching legal principle of Gonzalez and Gagnon to Petitioner's circumstances.

"The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. In making this determination, mere disagreement with the state court's conclusions is not enough to warrant habeas relief." Matteo, 171 F.3d at 890; accord Harrington, 131 S. Ct. at 785 ("an unreasonable application of federal law is different from an incorrect application of federal law"). Here, even if this Court were to second-guess the approach employed by Petitioner's trial judge during his September 11 and post-September 11 voir dire

44

sessions (the task this Court does not endeavor to undertake),
this Court would be constrained to conclude that the state
courts' dismissal of Petitioner's right-to-presence challenges on
the implied waiver ground was not an unreasonable application of
Supreme Court precedent.  Therefore, Petitioner's Ground One
challenges fail on the waiver basis alone.

## VI.   SUBSTANTIVE INSUFFICIENCY ASPECT

This Court's prior order, directing both counsel to file
supplements to their re-brief, stated, in relevant part, as
follows:

> the Court notes that the parties do not appear in
> dispute as to the core legal principle governing right-
> to-presence claims, i.e., that, while the circumstances
> where the defendant was absent during a relatively
> small, substantively minor, portion of his/her voir
> dire lend credence to finding of a harmless error, the
> circumstances where the defendant was involuntarily
> absent from all or the overwhelming majority of his/her
> jury impaneling, lend credence to finding of a
> reversible error.  Here, however, [the submissions
> filed by the parties thus far suggest that Petitioner's
> voir dire] falls neither within the definition of
> "minor portion of voir dire" nor within the
> circumstances that could be qualified as absence from
> "all or the overwhelming majority of the jury
> impaneling."  Rather, . . . Petitioner's circumstances
> seem to fall somewhere between the two aforesaid
> extrema.  The uniqueness of this case highlights a
> rather substantial gray area of the right-to-presence
> law associated with such "in-the-middle" circumstances
> that are rarely visited by the judicial decisions
> examining this constitutional right.  Since the
> scenario triggering a criminal defendant's right-to-
> presence claim occurs in state and federal courtrooms
> unfrequently, the right to presence is often treated as
> an orphan of constitutional law: while it cannot be
> said that there is dire scarcity of case law on this
> issue, there certainly have been no abundance of

> judicial review associated with the finer aspects and
> gray areas of this right.

Docket Entry No. 31, at 3-5 and n. 2 (footnote incorporated in the main text).

The Court, therefore, directed the parties to state "their legal positions as to: (a) the habeas policies associated with challenges arising from the "in-the-middle" circumstances; and (b) applicability of such policies to Petitioner's circumstances. See id. at 5. As noted supra, Respondents' elected to refocus their answer, limiting it solely to the issue of waiver. See, Docket Entry No. 42, at 1. Petitioner's counseled supplement, somewhat analogously did not inform the Court of Petitioner's position on the question posed. See Docket Entry No. 38.

Rather, it asserted that Petitioner "was excluded from a sufficiently significant part of jury selection" governed by the precedent examining those scenarios which could be qualified as illustrative of a defendant's absence from an "overwhelming majority" of his/her jury selection process.[23] See id. at 1.

## A.   Disconnect Between Ground One and Petitioner's Position

As noted supra, Petitioner's counseled position built on the

---

[23] Petitioner's pro se submissions, while seemingly aiming to cure what Petitioner perceived as deficiencies of his counseled brief, asserted effectively a position substantively indistinguishable from that offered in his counseled supplement. See, generally, Docket Entries Nos. 44 and 46.

46

statistical assessment of the *entire* <u>voir</u> <u>dire</u> transcript.[24]  <u>See</u>
Docket Entry No. 38, at 9-11 (equating Petitioner's circumstances
with those examined in <u>Gagnon</u>, <u>Faretta v. California</u>, 422 U.S.
806 (1975), and <u>Snyder v. Massachusetts</u>, 291 U.S. 97 (1934)).[25]

So asserted, Petitioner's legal position correlates to a
claim that his absence at side-bar and <u>in</u> <u>camera</u> conferences
prevented him from having an "opportunity to give advice or
suggestions to his lawyer concerning potential jurors."  Docket
Entry No. 38, at 10 (citation omitted).  However, there is a
logical disconnect between the so-asserted legal position and

_____

[24]  For instance, Petitioner's counseled submission asserted
that: (a) out of 67 <u>venires</u> "questioned in some manner by the
trial court [during the three days], 38 were questioned at some
point in chambers, [and thus] means . . . nearly 57%"; (b)
eighteen <u>venires</u> were excused upon being pre-screened on
September 13, which amounted to 27% of the total pool of 67
<u>venires</u>; (c) twenty <u>venires</u> out of the forty-nine who were not
excused immediately after pre-screening, were questioned in open
court and <u>in</u> <u>camera</u>, and those twenty amounted to 41% of the
forty-nine; and (d) the transcripts of the <u>in</u> <u>toto</u> dialogue
between those jurors who were impaneled and examined both in open
court and <u>in</u> <u>camera</u> amounted to 992 lines, out of which 504 lines
reflected <u>in</u> <u>camera</u> dialogue.  <u>See</u> Docket Entry No. 38, at 9-10

[25]  The holding of <u>Faretta</u> appears inapposite to the issue
at bar.  In <u>Faretta</u>, the Supreme Court held that the state could
not constitutionally force a lawyer upon a criminal defendant
because the defendant was literate, competent, and understanding,
and voluntarily exercised his informed free will in waiving his
right to the assistance of counsel.  Therefore, the reasons for
Petitioner's reliance on <u>Faretta</u> is not immediately obvious to
this Court.  Analogously, the rationale of Petitioner's reliance
on <u>Snyder</u> is not immediately apparent to this Court: in <u>Snyder</u>,
the petitioner's conviction was affirmed upon finding that denial
of the petitioner's request to be present when the jury viewed
the crime scene did not amount to denial of due process.

Petitioner's Ground One, which alleged that, had Petitioner been present at side-bar and in camera conferences, those impaneled jurors who, he believes, were not impartial triers of fact, would not have been impaneled.  Correspondingly, Petitioner's focus on the in toto statistics is unwarranted.  The only in camera statements relevant to Petitioner's Ground One are those made by the jurors who were, in fact, impaneled.  Hence, a relevant statistical analysis cannot be conducted by a mechanical line count of the transcribed lines reflecting dialogue between the trial judge and venires, since: (a) the explanations and questions posed *by the trial court* had no impact on Petitioner's "opportunity to give advice or suggestions to his lawyer concerning potential *jurors*"; and (b) the statements made by the venires who were excused during post-September-11 pre-screening, or excused upon sharing their post-September-11 hardships, or removed for cause or peremptorily did not contribute an iota to what Petitioner believes to be a biased composition of his jury.

Here, as the Court already detailed, the jurors who were both impaneled *and* questioned in chambers, either during the pre-screening or as part of voir dire, made in camera statements disclosing nothing but: (a) these jurors' prior criminal convictions; (b)  relationships to other people who were criminally prosecuted, convicted or wrongly accused of crime; or (c) employment concerns.  Paramountly here, all jurors'

48

statements relied upon by Petitioner, that is, the statements disclosing that some impaneled jurors were victims of crimes, were invariably made in open court.

**B.    "Middle-Ground" Scenario Does Not Warrant Habeas Relief**

As the foregoing illustrates, a close examination of Petitioner's _voir_ _dire_ establishes his absence only from a very minor portion of the jury selection process relevant to his Ground One challenges.  However, being mindful of Petitioner's counseled position that he was excluded from twenty to fifty percent of his _gross total_ _voir_ _dire_, the Court now turns to the question the parties left unanswered, that is, the effect of habeas policies on a right-to-presence claim based on the factual predicate depicting absence from a portion of _voir_ _dire_ falling between the "minor" and "overwhelming majority" _extrema_ expressly addressed by the Supreme Court.

As it has been stressed time and again, habeas relief is appropriate only upon finding of an unreasonable application of Supreme Court precedent.  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous."  _Lockyer_, 538 U.S. at 75.  "The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness.  It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state

court was erroneous." Id. (internal citations and quotations omitted); see also Matteo, 171 F.3d at 890 ("The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  In making this determination, mere disagreement with the state court's conclusions is not enough to warrant habeas relief").  Indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Harrington, 131 S. Ct. at 786 (citing Lockyer, 538 U.S. at 75); accord Rountree v. Balicki, 640 F.3d 530 (3d Cir. 2011) ("Applying AEDPA, we conclude that the New Jersey court's decision in this case survives review under §2254.  Although certain portions of the record can be argued to support [the petitioner's position], it is precisely because "fairminded jurists could disagree" with each other that we must affirm the state court's holding") (citation and internal quotation marks omitted).

Moreover,

Where state court decisions are guided only by general
constitutional standards (as opposed to specific,
bright-line rules), the "unreasonable application"
standard is particularly difficult to meet, because
such decisions are given a particularly generous
benefit of the doubt.  The Supreme Court has stated
that:

[The] range of reasonable judgment can depend in
part on the nature of the relevant rule.  If a

50

> legal rule is specific, the range may be narrow.
> Applications of the rule may be plainly correct or
> incorrect.  Other rules are more general, and
> their meaning must emerge in application over the
> course of time.  Applying a general standard to a
> specific case can demand a substantial element of
> judgment.  As a result, evaluating whether a rule
> application was unreasonable requires considering
> the rule's specificity.  The more general the
> rule, the more leeway [state] courts have in
> reaching outcomes in case-by-case determinations.
>
> Yarborough v. Alvarado, 541 U.S. [at] 664 . . . ; see
> also Renico [v. Lett, 130 S. Ct. 1855], 1864 [(2010)].

Watson v. Greene, 640 F.3d 501, 508 (2d Cir. 2011).

A district court's leeway to grant habeas relief is even

narrower when the general policies articulated by the Supreme

Court are expressed in the decisions that cannot qualify as a

precedent on point.  As the Supreme Court explained,

> A state court's determination that a claim lacks merit
> precludes federal habeas relief so long as fairminded
> jurists could disagree on the correctness of the state
> court's decision . . . . Evaluating whether [the]
> application [of a rule ensuing from Supreme Court
> precedent] was unreasonable requires considering the
> rule's specificity.  . . .  [Paramountly,] it is not an
> unreasonable application of clearly established
> [Supreme Court precedent] for a state court to decline
> to apply a specific legal rule that has not been
> squarely established by [the Supreme] Court.

Harrington, 131 S. Ct. at 786 (citations and internal quotation

marks omitted).

Consequently, the core policies of habeas law do not allow

this Court to venture into hypothesizing what the Supreme Court

precedent might have been, had the Supreme Court examined a

middle-grounds right-to-presence factual predicate.

51

> Imposing a surrogate "unreasonableness" standard at
> this time would be a risky proposition, as our
> redefinition might prove unfaithful to the Supreme
> Court's intended meaning.  . . .  To the extent that a
> nuanced, contextual interpretation of [the issue at
> hand] emerges from this process over time, this
> elaboration will be more useful and meaningful than any
> definition we might choose to impose ab initio.

Neal v. Puckett, 286 F.3d 230, 246 n.14 (5th Cir. 2002).

Thus, even if this Court were to reflect on the factual predicate prompted by Petitioner (depicting his absence from twenty to fifty percent of the voir dire process, assessed wholesale), the Court has no basis to equate these middle-ground facts with the "overwhelming majority" scenario where the Supreme Court found habeas relief warranted.  See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established [Supreme Court precedent]") (citation and internal quotation marks omitted).  A fortiori, this Court has no basis to equate Petitioner's absence from the minor portion of the voir dire relevant to his Ground One with the Supreme Court precedent Petitioner relies upon.  If anything, both the letter and spirit of that precedent runs counter to his position.

The Court of Appeals' decision in Alessandrello, 637 F.2d 131, provides a helpful amplification of the relevant precedent.

In Alessandrello, the defendants appealed their judgments of conviction, arguing that they were improperly excluded from jury

selection process.  The Court of Appeals, however, observed that
the matter from which the defendants were excluded covered only
one topic, and their attorneys were present and were free to
consult with their clients, hence diminishing any potential
harm.[26]  Pointing out that "constitutional rights are subject to
the harmless error doctrine," id. at 138, n. 11 (relying on
Chapman v. United States, 386 U.S. 18, 21-22 (1967)), which holds
that, "[if] there is no reasonable possibility of prejudice from
the error, it is deemed harmless," id. at 139 (citations
omitted), the Court of Appeals found that the trial court's
actions resulted, at most, in a harmless error, because

> [the] defendants were not excluded from the entire voir
> dire; they were present for all but one small portion
> of it. They saw each of the prospective jurors and

------

[26]   In Alessandrello, after the in-court portion of voir
dire,

> [the] judge . . . retired to [a] small anteroom,
> accompanied by the prosecutors and defense attorneys.
> He explained that he wished to examine prospective
> jurors individually on the matter of pre-trial
> publicity [so] to avoid the possibility . . . of having
> one person blurt out something prejudicial in front of
> the group of prospective jurors, thereby tainting . . .
> other prospective jurors.  The defense attorneys
> objected . . . , stating that the defendants should be
> present.  The judge responded that the room was so
> small [but] the defense attorneys . . . were free to go
> out and consult with their clients as often and as long
> as they wished.  . . .  While the defendants remained
> in the courtroom approximately 25 feet away, the judge
> conducted this portion of the voir dire.

Alessandrello, 637 F.2d at 135.

> heard each of them respond to questions about personal and general matters.

Id. at 139.

Here, Petitioner was excluded from a very small portion of the relevant voir dire (disclosing the jurors' prior criminal convictions, relationships to other people who were criminally prosecuted, convicted or wrongly accused of crimes, and employment concerns), i.e., he did not hear statements that were either inapposite to the issue of jury bias or indicative of the jurors' likely propensity to be sympathetic to Petitioner.

In light of the lack of Supreme Court precedent lending credence to Petitioner's position and under the instructive guidance provided in Alessandrello, the state courts' decision to dismiss Petitioner's voir dire challenges cannot qualify as an unreasonable application of clearly established Supreme Court precedent. Therefore, Petitioner's Ground One does not merit habeas relief.

## VII. CERTIFICATE OF APPEALABILITY DETERMINATION

When a state prisoner seeks a writ of habeas corpus, he does not enjoy the "absolute entitlement to appeal a district court's denial of his petition." Miller-El v. Cockrell, 537 U.S. 322, 335 (2003). Rather, the prisoner must obtain a certificate of appealability before he may appeal to the court of appeals. See id. Correspondingly, Rule 22.2 of the Local Appellate Rules of the Third Circuit provides:

54

> At the time a *final* order denying a petition under 28
> U.S.C. § 2254 or § 2255 is issued, the district judge
> will make a determination as to whether a certificate
> of appelability should issue.  . . .

Third Circuit L.A.R. 22.2 (emphasis supplied).

Here, the Court's decision resolves solely Petitioner's challenges raised in his Ground One.  His remaining fifteen Grounds, stayed thus far, are now subject to adjudication.[27] Since the Court's instant decision cannot qualify as a final order within the meaning of Rule 22.2, the certificate of appealability issue is reserved, and will be resolved upon final disposition of Petitioner's challenges.

## VIII. CONCLUSION AND OVERVIEW OF THE LITIGATION AHEAD

For the foregoing reasons, Petitioner's application for a writ of <u>habeas</u> <u>corpus</u> will be denied with regard to his Ground One.  Petitioner's appointed counsel will be released from his appointment, with renewal reserved.  Respondents will be directed to file an answer to Petitioner's remaining challenges.[28]

---

[27]  As the Court already explained in its prior decision, it would have been a waste of the parties and the Court's resources to address Petitioner's remaining challenges had the Court determined that Petitioner's Ground One merited habeas relief.

[28]  The brief submitted by Respondents' current counsel was both thorough and impressively free of "boilerplate" language. The Court notes its certainty that Respondents' future submissions would be equally thoughtful and free from the unfortunate shortcomings that mired the initial filing made by Respondents' original counsel.  <u>See</u> Docket Entry No. 23.

Petitioner will be allowed an ample opportunity to traverse.[29] The Clerk will be directed to administratively terminate this matter; the Court will order reopening of this action upon receipt of Respondents' answer to Petitioner's remaining claims, and Petitioner's filing of his traverse.

No statement made in this Opinion or in the Order filed herewith shall be construed as withdrawal of this Court's jurisdiction over this matter.[30]

------

[29] Petitioner's, seemingly, has preference for submitting two pro se briefs, be it to this Court or to state courts. The Court, therefore, will allow Petitioner additional time to file his traverse, so to encourage Petitioner's filing of one well-drafted document stating all his arguments.

[30] The courts agree that "an administrative closing has no effect other than to remove a case from the court's active docket and permit the transfer of records associated with the case to an appropriate storage repository." Lehman v. Revolution Portfolio LLC, 166 F.3d 389, 392 (1st Cir. 1999). The Court of Appeals also discussed the tool of administrative termination with approval, noting its use for the purposes of effective case management. See Penn W. Assocs. v. Cohen, 371 F.3d 118, 126-28 and n. 9 (3d Cir. 2004); see also Mercer v. Allegheny Ludlum Corp., 132 F.R.D. 38, 38-39 (W.D. Pa. 1991), aff'd, 931 F.2d 50 (3d Cir. 1991) (expressing the same sentiment). Moreover, the Penn Court: (a) suggested that a district court's resort to the tool of administrative termination is indicative of the district's tidy docket management, see id. at 128 (noting that the "Lehman's view of administrative closings has been followed by the Courts of Appeals for the Tenth and Eleventh Circuits" and citing, inter alia, the concurrence language in American Heritage Life Ins. Co. v. Orr, 294 F.3d 702, 715 (5th Cir. 2002), which observed that "administrative closure reflects nothing more than the federal courts' overarching concern with tidy dockets"); and (b) concluded its assessment of the tool with the following unambiguous endorsement: "[administrative termination is] a device that, when used in correct context, enhances a district court's ability to manage its docket." Id.

An appropriate Order accompanied this Opinion.


*s/ Dickinson R. Debevoise*
_____
**Dickinson R. Debevoise**
**United States District Judge**

Dated: December 14, 2012